HYDE *vs.* HYDE.

### *In the matter of the Estate of* BENJAMIN G. HYDE, *deceased.*

The intestate, previous to the death of his wife, had an unlawful connection with
another woman, by whom he had several children. His wife having died, he
sometime after introduced the person with whom he had been living, as his
wife, and made her known as such to his friends and acquaintance. In
addition, a witness testified to the solemnization by a clergyman of a private
marriage : and it was *held,* under the circumstances, that a contract of mar-
riage was established. Where the intercourse has been meretricious in its
inception, there must be evidence to show that its character was subsequently
changed, but it is not indispensable to prove a ceremonial marriage. If there
is enough to satisfy the court that the parties recognized new relations, and
held themselves out to the world, and to their associates, as man and wife ; if
they by their conduct and declarations professed to be bound by marital ties,
and thus exhibited the continuation of their cohabitation upon a different foot-
ing from what it had formerly been, the conclusion may be in favor of a
marriage, notwithstanding there was no formal solemnization.

R. L. LARREMORE, *for Petitioner.*

JAMES McGAY,
J. C. HAYS, *for Widow.*

THE SURROGATE.—The decedent died January 4th, 1856.
Louisa Hyde, claiming to be the intestate's widow, took out
letters of administration upon his estate, and on an applica-
tion by the guardian of Charles E. Hyde, an infant child of
the deceased, to revoke the grant of letters, there has been a
contestation as to the marriage of the administratrix. It
appears that the decedent and Louisa lived together some
seventeen years, and had children ; that during a portion of
this period Mr. Hyde had a wife living, who died October
7th, 1852 ; after whose decease, it is alleged, a contract of
marriage was formed between the decedent and Louisa, now
claiming to be his widow. Mrs. Bollas, who was intimately
acquainted with them, and in the habit of exchanging visits

several times a week, testifies, that after the death of his wife, Mr. Hyde contemplated marriage with Louisa, and it was the subject of conversation frequently. She says, " about a week after he told me his first wife was dead, he said he intended to marry Louisa, and to do justice to her, as he thought he ought to : at the same time he wished me to keep it private, on account of his children, by Louisa—his eldest daughter in particular—I mean for the sake of their reputation. He mentioned it several times after that. I heard them speak together on that subject. I heard it frequently spoken of, when I was there; and always, on account of his eldest daughter, to have it privately done." The witness states, that the marriage ceremony was performed at the house the decedent occupied, No. 47 Clinton-street, on the seventh of May, 1853. I will give her statement in her own words :— " The day of the marriage, I was there on a mere casual call. I saw them both. The first that was said about it, I mentioned it myself. I turned round to him, and said, ' Benjamin, you have often said you intended to be married;' and I asked him when he intended to be married. This was in their sitting-room. He turned round, and said, he might as well be married then as at any time, and rather. He told her then to get ready ; to dress herself, and he would go and get a clergyman. He was sober ; there was no sign of liquor about. She said she would get ready. He was then changing his clothes. When he got ready, he went out, and she dressed herself. He was gone about three-quarters of an hour or an hour ; I could not tell exactly. He came back with a clergyman in company. I remained at the house meanwhile. The clergyman was brought into that room, and from there they adjourned to the parlor. I believe Louisa was introduced to the clergyman in the sitting-room .He looked like a clergyman ; from appearance, I should judge he was. There was a prayer made by the cler gyman after the ceremony. The minister knelt down. During the course of the ceremony, the couple stood up together. He first asked Mr. Hyde, if he took Louisa to be his wedded

wife—and then her, if she would take him for a husband. He made a few remarks on the duty of man and wife. This was all done with gravity. Mr. Hyde went out the door with him. I believe there was a certificate. I heard the minister tell Mr. Hyde to call for one. I remained there during the afternoon. Mr. Hyde went out shortly after, to his place of business. They lived together as man and wife after that. Mr. Hyde after that alluded to the ceremony— said he was glad he had performed his duty. He said that many a time. He introduced her as his wife after that, and took her about, the same as other husbands."

James Hallock, who knew the decedent ten years and up-wards, heard him say, the day of his death, he wished the claimant to have his store. He also states, in respect to their cohabitation : " within the last eighteen months, which is about the time I first knew Mrs. Hyde, he called her his wife, introduced her to me as his wife, always spoke of her in that way in my presence. They lived together the same as other married people, so far as I know. I was introduced to her at his place, 98 Houston-street, his store. He told me that was his wife. I visited the house very frequently, and was on terms of intimacy with the husband. His disease was said to be congestion of the brain. He was not perfectly sane du-ring his illness."

Catharine Welkin, a domestic, who was living in the house at the time of the alleged marriage, states that she supposed the parties to be husband and wife, and they treated each other as such. She thought they were married when she first went there, and she never heard of the wedding mentioned by Mrs. Bollas.

Austin Spencer knew the decedent for about eighteen months, and the claimant twelve months. He says, " he introduced this lady to me as his wife." James L. Campbell was acquainted with Mr. Hyde for fifteen years, slightly, and the last two years intimately. He testifies, " I have known Mrs. Hyde ; about fourteen months ago I was introduced to her, by Mr. Hyde, as his wife. . . I was once at the store, 98

Houston-street, and some one had called for Mr. Hyde, and it was said he had gone to see his wife in Clinton-street. Mr. Skidmore, the husband of a sister of his first wife, made the remark, that Mr. Hyde was no more married to her than he was. When Mr. Hyde returned, he was informed of this circumstance. I said to him, I would not permit a person to come in my store and say that. Mr. Hyde said, 'Mr. Campbell, I am lawfully married; I will wager my store against fifty dollars.' This was previous to my being introduced to her. After that, I was there perhaps once a week, and my wife also. Mr. Hyde always told me he was lawfully married to Mrs. Hyde; he thought there would be means used to try and leave her penniless; and he wished me, if I was a friend to him, to do all I could do for her. This was the Saturday previous to newyear's day last. He said, he thought he might die suddenly, and 'there are projects on foot to leave my wife Louisa penniless.'"

Mrs. Campbell testified, that she had known the decedent several years, and Louisa since the first of April last. She deposes, " he introduced Mrs. Hyde to me as his wife, and likewise Louisa, as his daughter. He has introduced her as his wife to other persons, several times, in my presence. He has introduced her to a dozen people, spending the evening at my house, as his wife; and I have heard him introduce her in his store, as his wife, to men that were in his store. He said that was his wife. . . About two weeks before his death, speaking of his family, he said they would wrong his wife and children, if he were dead."

Isaac T. Valentine testified, that he frequented the decedent's house fifteen or sixteen months ago. He says, " he introduced this woman to me as his wife. I was there almost every day for five or six months. They lived together as man and wife. I have been out in their company; I have been to balls with them, Mr. and Mrs. Hyde and their daughter. I have been present when he introduced her to other people, and always as his wife." Mrs. Louisa Hyde, who was examined by me, made a statement similar to that given

by Mrs. Bollas, in relation to the marriage ceremony on the 7th of May, 1853. She also testified, that the minister did not leave a certificate, but Mr. Hyde procured one some weeks afterwards, gave it to her, and she kept it, among their papers, in a bureau, until she first missed it, after her husband's death."

This is all the evidence in favor of the marriage. To overturn it, Mr. Robert G. Hyde the intestate's brother, together with his wife, are called, and relied upon, as the principal witnesses. The former states, that after the intestate's death, he was requested by Louisa to call at the Surrogate's office, and see about the affairs of the estate ; that he did so, and on the next day asked Louisa if she was married to his brother, and she replied, *no.* His statement is this : " I said, ' Louisa are you married ?' and she said, ' no, Bob.' ' I said to her, ' can you swear ?' She paused awhile, and said ' I will ;' that is, to swear she was the wife of Benjamin Hyde. I said next to her, ' have you any witness ?' She said, ' yes.' That was the end of the conversation at that time. She asked me to call the next day and see the witness. I called the next day, and she pointed out Mrs. Bollas. I asked Mrs. Bollas, if she was willing to swear. She said she was ; that she was a witness to the marriage of him. The next thing was talks of a minister. I asked if they could get a minister. They said they didn't know. Louisa says, I guess we can get a Dutch minister, through her sister-in-law or sister. I told her, I thought it would be a dangerous piece of work, and asked her if she thought a Dutch minister would swear to a lie. She said she thought it would be rather a dangerous piece of work. That was about the end of that day's work. They got a book, and Mrs. Bollas agreed to have the seventh of May as the day of the marriage. The reason was, that being so soon after his wife had died, they might pretend to keep it private. That was the agreement. We three were together. Mrs. Bollas wrote this down in a book—the date of the marriage—to let it be thrown and scattered around the room, so that the date might be seen. The daughter Louisa

was in the room at that time. The book, with the marriage written in, was, I think, taken down to Mrs. Campbell's house. I think I heard them say so. Then there was some talk between Mrs. Bollas and Louisa, that the date was to be blurred out, so that the daughter should see it, and shouldn't know how long her mother had been married."

Mrs. Hannah Hyde, the wife of this witness, testified, that about two weeks before the first of January last, she met the decedent in Grand-street, and told him he looked badly, and she thought he would not live long. She then states, " he said he had a secret he had wanted to tell me for a long time, but didn't like to, for fear of hindering me from coming to his house. He asked me if I would keep that secret if he would tell me. I said I would if it was right. He then said, ' I am not married to Louisa, nor I never intended to be—that he did not want me to reveal it, on account of his daughter— the shame and disgrace it would bring upon her.' He asked me if I would still be a friend to his children and Louisa, and I said yes, I would. That was the end of our conversation." This witness also testified to some conversation between herself, Louisa, and Mrs. Bollas, after the decedent's death, in reference to the time of the decedent's first wife's death ; Louisa saying, if she knew the time she could tell the time of her own marriage. " She thought it was about a week afterwards," but Mrs. Bollas said no, it was between four and five months after ; and that she, Mrs. Bollas " went with them, when they were married, to the minister's." She adds, " last summer Mrs. Hyde was at her bureau drawer. She said 'Hannah, do you want to see my certificate?' I said ' yes ;' she took out a small paper, all in writing, and I leaned on her shoulder, and she read it to me ; and it read as a cer- tificate does. I do not read all writing. I did not read that. She showed me her wedding gloves. . . She held the certifi- cate in both hands, so that I might have read it. She said she had always kept the gloves sacred since her marriage." " Mr. Hyde asked me to come to his house, to see his wife, to see Louisa, and I did so. This was about eighteen months

ago. . . Mr. Hyde asked me if I would come to see his wife— I think he said to see Louisa—but I would not be positive which it was. I believed she was his wife. I should not have gone there if I had not supposed so. He never had asked me to visit her before. I did not ask him when he was married. I thought, by what he said to me, it was all right enough. He had no other place of living. I did not observe anything different in their intercourse from that which is usual between man and wife." Mr. Reed, in respect to the decedent and the claimant, says, " I have heard they were married. The reputation in the neighborhood, so far as I can say, was, that six out of ten I met would say, they didn't believe they were married." The witness then mentions three persons who spoke to him on the subject since Hyde's death, but " not before, because it was not brought in question before." These are the general features of the testimony, and there is on several points positive contradiction between Mr. and Mrs. Robert Hyde, on the one side, and Mrs. Bollas and the claimant, Louisa, on the other. As to the alleged declaration of the decedent to Mrs. Robert Hyde, it is observable, in the first place, that it was sudden, and in direct opposition to his previous conduct in leading the witness to suppose he was married. A casual interview in the street was a somewhat strange occasion for the development of such a confidence. Nor were the subsequent statements of the witness in conformity with this revelation. It is true she says she was told to keep the secret, but she was certainly not called upon to volunteer an affirmation of the marriage. But Mrs. Bollas testifies, that after the decedent's death, " Mrs. Robert Hyde said she would like to see any person dare to dispute that marriage, for she had seen the certificate." Mrs. Campbell also says, " after the funeral, the same day, Mrs. Robert Hyde told me, if any one was dissatisfied as to the marriage, to come to her, she had seen the certificate ;" and Mrs. Bollas gives the following explanation of " the secret :" she mentioned "that Mr. Hyde had met her, and told her, Hannah, you have always kept the secret, in regard

to my being with Louisa—on account of little Louisa keep it so—not to let the daughter know they were not married before she was born. That she stated was the secret." Mrs. Robert Hyde states that Mrs. Bollas said she *went* to the minister's and witnessed the marriage, and Mrs. Bollas denies that. If she said she witnessed a marriage before a minister, this may very easily have been misunderstood, as meaning that they *went* abroad to be married  And so likewise in regard to the conversation in the street, between her and the decedent, which, if he spoke about concealing from his daughter that he had not been married when she was born, and about that only, would be quite consistent with the other facts in the case, and yet might be misconstrued into a general denial of marriage. As to the statement of Robert Hyde, that the claimant, after his brother's death, told him she was not married, it is denied under oath by her. Still, as she is a party interested, the question would yet remain as to the degree of credibility to be attached to his testimony. Evidence of conversations and admissions is always to be received with great caution. Now this witness is contradicted on another very important point by Mrs. Bollas. He says that there was a regular plan or conspiracy between Louisa and Mrs. Bollas to procure letters of administration, on perjured testimony, and he himself was privy to it—aiding, abetting, and counselling. He came with Louisa to the Surrogate's office, and was present when she swore she was the widow, and stood by at the consummation of what he claims to be a fraud, and which, if his statement is to be credited, was a bold and deliberate crime. At the time this scheme is said to have been concocted, he testifies that Mrs. Bollas was present, and yet Mrs. Bollas contradicts him in the most positive terms; and again, on other points, the latter witness is contradicted by Mrs. Robert Hyde.

Looking at the evidence, in respect to the cohabitation of the decedent with Louisa, it does not seem to me very important to determine whether the ceremony took place, testified by Mrs. Bollas to have occurred on the 7th of May,

1853. But still, the probability appears to be in favor of the truth of the claimant's allegation on that point. The first wife was dead. Hyde had been living with this woman some seventeen years, and though the connection was immoral and unlawful, its very character should have led either to its discontinuance or to its legalization. Four of their six children were living, and one of them verging on womanhood, and there were grave reasons why a marriage should be effected. Neither in morals nor in law could such a course be regarded with disfavor. On the other hand, the daughter had been kept in ignorance of the terms upon which her parents had been cohabiting, and for her sake it might be deemed desirable to avoid the recognition of the meretricious character of the previous connection, by a public ceremony of marriage at so late a day. This would be an inducement to privacy. Again, Mrs. Robert Hyde states, that during the decedent's life-time, Louisa, claiming to be married, exhibited to her what she declared to be a marriage certificate; and although Louisa does not recollect the circumstance, and asserts that she is unable to read, and did not read it to her, yet she asserts there was such a paper, and I am inclined to believe it was exhibited to Mrs. Robert Hyde. The disappearance of the certificate, and the failure to remember the name of the clergyman who performed the ceremony, make against Louisa's claim, but they are not controlling facts. In support of Mrs. Bollas' testimony, Mrs. Campbell states, that she was introduced to Mrs. Bollas at the decedent's house, about six weeks before his death, and that he said, " here is a woman knows more about my family affairs than anybody else; he said he thought a great deal of her." It is also observable, that after the date of the alleged ceremony, Hyde invited his sister-in-law to his house, and she commenced visiting there under the belief they were married; that from about the same time he began to introduce Louisa to his acquaintance and friends as his wife, and was open, public, free, and in one case marked and positive in his recognition of her as his wife. These circumstances tend to corroborate

the evidence in favor of a marriage ceremony, especially the declaration to the witness, Campbell, that he was "lawfully married." But I am quite clear, whether a ceremony was ever performed or not, that there is sufficient proof in the declarations of the decedent, and in the manner in which he introduced her and cohabited with her, to establish a presumption of a marital contract. The previous unlawful character of the connection does not interfere with this view. I am asked to hold, that where the previous intercourse has been adulterous, the subsequent connection will be presumed to be of the same character, unless a ceremonial marriage is shown. But my opinion is otherwise. I admit that a mere continuance of the cohabitation after the death of the first wife, would not lay the foundation for presuming a marriage. There must be, in addition, some testimony to show the nature and character of the connection to have been changed; but that testimony is not limited to a ceremonial marriage. The whole matter, in truth, resolves itself into a mere question of evidence, and if there is enough to satisfy the mind of the court that the parties recognized new relations, and held themselves out to the world and to their associates as man and wife; if they, by their conduct and declarations, professed to be bound by marital ties, and thus exhibited the continuation of their cohabitation upon a different footing from what it had been formerly, the conclusion may be in favor of a marriage, notwithstanding there was no formal ceremony or regular solemnization. Here was a complete *consortium vitæ;* the parties cohabited without clandestinity ; the husband said he was "lawfully" married, he made his wife known in that character to numerous persons ; and they thus established the relation of husband and wife, beyond the reach even of an isolated secret confession to the contrary, made in a corner, if any such confession were made. Though there are some irreconcilable contradictions between some of the witnesses, yet looking at all the circumstances, and having in view the bearing of the parties testifying, I think the probabilities are in favor of the marriage on the 7th of May, 1853; and in any

HYDE *vs.* HYDE.

event, I have no doubt that the proof in respect to the subsequent conduct, declarations and cohabitation of the decedent and Louisa, affords abundant grounds for a judicial sentence that they were man and wife; and there must be a decree to that effect.